LEE R. BOGDANOFF (State Bar No. 119542)
DAVID M. STERN (State Bar No. 67697)
MATTHEW C. HEYN (State Bar No. 227474)
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Telephone:  (310) 407-4000
Facsimile:   (310) 407-9090
Email:        mheyn@ktbslaw.com

Bankruptcy Counsel for Alfred H. Siegel
as Interim Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>INDYMAC BANCORP, INC.,<br>a Delaware corporation,<br><br>     Debtor. | Case No.: 2:08-bk-21752-BB<br><br>Chapter 7<br><br>**DECLARATIONS OF JULIA J. RIDER AND ALFRED H. SIEGEL, CHAPTER 7 TRUSTEE IN OPPOSITION TO MOTION FOR RELIEF FROM STAY**<br><br>[FILED CONCURRENTLY WITH OPPOSITION TO MOTION FOR RELIEF FROM STAY OF DIRECTOR'S AND OFFICERS; PROOF OF SERVICE]<br><br>     **Hearing**<br>Date:  October 28, 2008<br>Time:  10:00 a.m.<br>Place:  Courtroom 1475<br>      255 East Temple St.<br>      Los Angeles, CA 90012<br>Judge:  Hon. Sheri Bluebond |

## DECLARATION OF JULIA J. RIDER

I, Julia J. Rider, do declare as follows:

1. I am an attorney admitted to practice before this Court and am president of Julia J. Rider, a professional corporation, which is a partner in the law firm of Jeffer, Mangels, Butler & Marmaro LLP (the "Firm"), one of the law firms assisting Alfred H. Siegel, Interim Bankruptcy Trustee for IndyMac Bancorp, Inc. ("Bancorp"). The facts set forth herein are personally known by me to be true and, if called upon to testify as a witness thereto, I could and would competently do so.

2. I make this Declaration in support of the *Opposition of Trustee to Motion for Relief from Stay by Former Directors and Officers* (the "Motion").

3. As set forth in the Application to employ my Firm previously filed with the Court, my Firm was engaged to assist the Trustee in matters related to insurance, including the types of insurance policies at issue in the Motion, that is, directors and officers liability ("D&O") insurance and fiduciary insurance. Since 1981, I have advised clients on insurance matters, including D&O insurance, and have represented clients in court proceedings directed at obtaining insurance coverage. My experience has included representing the Federal Deposit Insurance Corporation in actions against former officers and directors of financial institutions, which were cases that involved both D&O and fiduciary insurance. I have also represented defendants in securities fraud actions in their negotiations with and lawsuits against D&O insurers for payment of fees and damages claims. As a result of my experience, I am familiar with the types of policies at issue in this matter and with the case law which has developed with respect to these types of policies.

**The Bancorp's Insurance Program.**

4. At the beginning of my Firm's engagement I was provided with copies of D&O Policies and Fiduciary Policies for the coverage years 2007-2008 and 2008-2009 which were purchased by Bancorp. I have reviewed those policies attached to the Declaration of Todd Rosen, accompanying the Motion, and have also reviewed other policies and policy binders for those coverage years, true and correct copies of which are attached

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

hereto as Exhibits 1 through 8 and summarized on the chart appended hereto.

5. As shown on the declarations pages of the policies and summarized on the chart appended hereto, at least $1,777,920 in premiums for 2007-2008 policies and at least $6,113,281 in premiums for 2008-2009 policies were paid. As the Trustee has not yet received access to all of Bancorp's records, I cannot ascertain whether additional payments were made for extended discovery periods ("tail coverage"), which would be substantial, or whether there were any other charges such as statutory taxes, fees, and other state-specific premium charges.

**Entity Coverage.**

6. Subject to self-insured retentions and a priority-of-payments provision (each described below), Bancorp has the right to coverage under the D&O Policies for a "Company Loss which the Company is required or permitted to pay as indemnification to any of the Directors and Officers during the Policy Period for an Individual Act" ("Side B Coverage"). The Rosen Declaration indicates that "counsel for certain Movants received pre-petition retainers from IndyMac for defense costs, totaling, in the aggregate, $950,000." Rosen Decl. ¶ 14. If the Bancorp made such advances, the Bancorp estate may have a current claim for reimbursement against the D&O Policies, depending on whether the Bancorp has advanced amounts or incurred expense costs adequate to exhaust the self-insured retention under the D&O Policies.

7. Subject to the same self-insured retentions and a priority-of-payments provision, Bancorp has the right to coverage for a "Company Loss resulting from any Claim first made against the Company during the Policy Period for a Corporate Act" ("Side C Coverage"). Side C Coverage can provide the estate with defense and indemnity for claims that may be asserted in the Bancorp's case, including a current right to be defended and indemnified against lawsuits claim asserted against Bancorp.

8. The Fiduciary Policies provide an additional $10 million of coverage for ERISA claims for each of the 2007-2008 and the 2008-2009 coverage years. Bancorp also has the right to coverage under the Fiduciary Policies for ERISA lawsuits and claims that

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

may be asserted in the Bancorp's case, including a current right to be defended and indemnified against lawsuits and proofs of claim asserted against Bancorp.

9. There is a substantial disparity between the amount of insurance afforded Bancorp and that afforded the directors and officers. These disparities include:

(i) The limits of liability for all policies for each of the 2007-2008 and 2008-2009 policy years were $80,000,000. However, in each year, only the first $40,000,000 included Bancorp as an insured, either to cover payments it might make to indemnify officers and directors (Side B Coverage) or for claims asserted directly against Bancorp (Side C Coverage). The remaining $40,000,000 covers only the officers and directors (Side A Coverage).

(ii) Bancorp is required to bear substantial self-insured retentions before any insurance payments are available to it. For example, in 2007-2008, the D&O retentions for Bancorp Side B and Side C Coverage were $2,500,000 per claim. For the 2008-2009 policies, these amounts were increased for alleged securities law violations to $5,000,000 per claim. While the individual directors and officers did not have to pay any retention before defense costs would be paid, Bancorp would be required to pay millions before being able to access any insurance payments, including any defense costs.

10. All of the policies provide that the costs of defense reduce the limits of liability. This means that if the Movants' motion is granted and they then proceed to incur $10 million in fees defending the various suits that have been filed against them and Bancorp, the primary D&O policy will be exhausted. It is conceivable that the directors and officers could exhaust a substantial portion of the insurance on which Bancorp is named as an insured by vigorously litigating the various cases. If the directors and officers' defense costs consume the first $40 million of coverage, they still have another $40 million to draw upon. Granting the directors and officers unfettered access to the insurance monies could result in Bancorp losing most if not all of its insurance.

DECLARATIONS OF JULIA J. RIDER AND ALFRED H. SIEGEL, CHAPTER 7 TRUSTEE IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

**The Priority of Payments Provision.**

11. In addition to the substantial differences in the amount of coverage and the retentions required to be paid by Bancorp, the policies contain a provision that may be prejudicial to Bancorp's rights as an insured. As interpreted by the Movants, the so-called "priority of payments" provision in the D&O policies could make any coverage for Bancorp illusory, despite the millions paid by Bancorp for the policies. In brief, the Movants contend that all their fees, costs and any damages assessed against them must be paid before the Bancorp receives any benefit from the insurance. However, as set forth in the Trustee's Opposition, the Movants' interpretation is flawed in several respects.

12. First, the Motion characterizes the priority of payments provision as giving the Movants "present rights" to the proceeds of the D&O policies "expressly superior" to any "contingent rights" that Bancorp may have in such proceeds (Motion, p. 7, ll. 16 - 18), and further states that Bancorp is entitled to nothing from the D&O policies until the Movants' claims have been satisfied (*Id.*, p. 13, ll. 16 - 18). The language of the provision does not support the Movants' draconian interpretation. The provision, paragraph IV.E of the Lloyd's policy, Exhibit A to the Rosen Declaration, states as follows:

> Payments of **Loss** by Underwriters shall reduce the Limit of Liability. Underwriters shall pay **Loss** in the order in which **Loss** is incurred. However, if **Loss** payable under Insuring Clause 1.A. and one or more of the other Insuring Clauses is incurred contemporaneously, Underwriters first shall pay Loss payable under Insuring Clause 1.A. After such **Loss** has been paid, if the Limit of Liability has not been exhausted, Underwriters shall then pay **Loss** payable under Insurance Clause 1.B. After such Loss has been paid, if the Limit of Liability has not been exhausted, Underwriters shall then pay **Loss** payable under Insuring Clause 1.C. Underwriters shall have no obligation to pay **Loss** after exhaustion of the Limit of Liability.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

-4-

DECLARATIONS OF JULIA J. RIDER AND ALFRED H. SIEGEL, CHAPTER 7 TRUSTEE IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

13. This provision says nothing about contingent rights, subordination of any interest of Bancorp or any of the other phraseology used by Movants. Rather, it is clear that the governing factors are whether a "loss" occurred and when a "loss" occurred. If Bancorp sustained a loss before a director or officer sustained a loss, Bancorp's loss would be paid first. It is only when the losses occur contemporaneously that the priority of payment provision may apply. It is therefore erroneous to characterize Bancorp's interest in the proceeds of the policies as "contingent" and "subordinated" to the interests of the individuals. That is particularly true in this case where Bancorp is named as a defendant in both the securities class actions and in certain of the ERISA class actions and is alleged to be jointly and severally liable along with directors and officers.

14. Second, "Loss" is defined as "damages, judgments, settlements and Costs, Charges and Expenses incurred by any of the Directors and Officers" (Exh. A to Rosen Decl., p. 53.) Since the definition of "Loss" does not include the entity, the priority of payments provision may not apply to the entity coverage for Bancorp.

### **Cancellation Provisions.**

15. Each of the D&O policies that I have seen for the 2007-2008 and 2008-2009 policy years has a cancellation provision permitting Bancorp to unilaterally cancel the policy without the consent of other insureds. (*See, e.g.*, Rosen Decl., Ex. A, p. 60, ¶ VII.C; Ex. B., p. 82, ¶ XIII.A.4.; Ex. C, p. 87, ¶ 12(b); Ex. D, p. 103, ¶ VII; Ex. E, pp. 138-39, ¶ VII.C.; Ex. F., p. 167, ¶ XIII.A.2; Ex. G, p. 218, ¶ V.c.; Ex. H, p. 233, ¶ XI, p. 235, ¶A.1.) Cancellation is therefore an option if the policies have no value to the estate because it would enable the estate to benefit from the pro-rated return premium.

### **Reservation of Rights by Carriers**

16. I have spoken with Theodore Boundas, counsel for Lloyd's, the primary D&O carrier, and with Jason Cronic, counsel for XL Specialty Insurance Company ("XL"), the fiduciary insurer, with respect to the coverage positions of Lloyds and XL as to the claims being asserted by the insureds under their respective policies. Attached hereto as

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

1  Exhibits 9 and 10 are true and correct copies of letters from Mr. Boundas and Mr. Cronic
2  setting forth the coverage positions for their clients.

3      17.    These reservations of rights letters contradict the impression given by
4  the Motion that the directors and officers have an absolute right to the proceeds.
5  Mr. Boundas' letter states, in pertinent part, that:

> Underwriters consent to the incurrence by your respective clients of,
> and shall advance on their behalves, reasonable and necessary Costs,
> Charges and Expenses, subject to the following: the execution of a
> mutually acceptable interim fee advancement and mutual reservation
> of rights agreement which includes a several obligation to repay in the
> event of a determination of no coverage under the Policy....

Exhibit 9, at 157.

    18.    Similarly, XL Specialty reserves all rights including the right to recoup any fees and costs advanced upon a determination that no coverage exists.  *See* Exhibit 10, at 165-67.

    19.    In my conversations with Mr. Boundas, Mr. Cronic and others, I have confirmed that the Debtor's insurance broker has tendered to the appropriate insurance carriers pending actions against the Debtor.  In addition I have separately tendered for coverage the proofs of claim attached hereto as Exhibit 12, 13, and 14, which have been filed in the bankruptcy case.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 14, 2008.

_____
Julia J. Rider

## **DECLARATION OF ALFRED H. SIEGEL, CHAPTER 7 TRUSTEE**

I, Alfred H. Siegel, declare and state as follows:

1.  I am the duly appointed interim chapter 7 trustee in the above-captioned bankruptcy case (the "Case") of IndyMac Bancorp, Inc. (the "Debtor"). Except as otherwise indicated, all statements in this declaration are based on my personal knowledge. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein.

2.  I make this Declaration in support of the *Opposition of Trustee to Motion for Relief from Stay by Former Directors and Officers* (the "Motion").

3.  On July 17, 2008, the Federal Deposit Insurance Corporation (the "FDIC") placed IndyMac Bank, F.S.B. (the "Bank") into federal conservatorship, seizing control of the Bank's books and records, which had been maintained by Bank employees and agents on behalf of the Debtor. On July 31, 2008 (the "Petition Date"), the Debtor filed a petition for relief under chapter 7 of the Bankruptcy Code.

4.  On August 4, 2008, I accepted my appointment as chapter 7 trustee in this Case. On September 11, 2008, I attended the Meeting of Creditors in this Case. As a result of a challenge at the meeting, which I believe is unmeritorious, I have not yet been confirmed as permanent trustee, and must wait for confirmation at a hearing scheduled for October 30, 2008.

5.  Consistent with my duties to investigate the financial affairs of the Debtor and to collect and reduce to money the property of the estate, I have commenced my investigation of the events and transactions culminating in this chapter 7 Case. Shortly after my appointment as interim chapter 7 trustee, I learned that the FDIC seized control of substantially all of the Bank's books and records the Debtor's books and records and, to date, remains in control of these books and records. My professionals and I are in the process of reviewing a limited universe of documents that thus far has been made available by the FDIC and others that I understand the Debtor's former counsel, Orrick, Herrington & Sutcliff LLP,

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

copied from computers at the Bank shortly before the FDIC's seizure of the Bank. Efforts are also underway to review documents maintained by other former counsel of the Debtor.

6. Since my appointment, my attorneys and I have interacted with (i) Mr. Michael W. Perry (who, until recently, was the sole remaining officer of the Debtor, as it is my understanding that Mr. Perry either has resigned or shortly will be resigning), (ii) his counsel, (iii) representatives of the FDIC, and (iv) others in order to obtain access to information regarding the Debtor's financial affairs. Using records that were made available to the Debtor's former accountant, Ernst & Young (the "E&Y Documents"), I have caused the timely filing of the Debtor's tax returns with federal taxing authorities and have developed an approach to requests for documentation propounded by the U.S. Department of Justice and the Securities and Exchange Commission related to the Bank's failure.

7. I have reviewed the Schedules of Assets and Liabilities and Statement of Financial Affairs (the "Schedules"), filed by the Debtor on August 11, 2008, true and correct excerpts of which are attached hereto as Exhibit 11. Based on the Schedules, it appears that the Debtor's principal asset was its 100% equity interest in IndyMac Intermediate Holdings, Inc., whose primary asset is all of the outstanding common stock in the Bank. The Debtor's scheduled liabilities exceed $440 million, which does not include any claims of the FDIC. Exh. 11, at 170. These scheduled liabilities might materially underreport the true claims against the estate since the Schedules appear to have been prepared without access to the books and records of the Debtor. It appears from the Schedules that they were prepared from the memory of the Debtor's representative, discussions with the Debtor's counsel, and an incomplete review of a limited number of documents. As the Schedules disclose: "there can be no assurance that these Schedules and Statements are complete and substantial errors or omissions may exist." Exh. 11, at 169.

8. My investigation is at a very early stage. As part of a broader investigation of the Debtors' affairs, I intend to conduct several examinations of third parties.

9. Although, I am not currently aware of all of the transfers from the Debtor to the Bank, the records in my possession (including the E&Y Documents) and my

-8-

DECLARATIONS OF JULIA J. RIDER AND ALFRED H. SIEGEL, CHAPTER 7 TRUSTEE IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

conversations with Mr. Perry reflect that, in the two years prior to the Petition Date, at least $616,227,000 was downstreamed from the Debtor to the Bank and, of that amount, approximately $375,000,000 was transferred within one year of the Petition Date. Without limiting the foregoing, based on the information available to me and my professionals at this time, I believe some or all of such transfers or "downstreaming" may have been made at a time when the Debtor and the Bank were, or were rendered, insolvent, undercapitalized, or unable to pay their debts as they became due. As a result, the Debtor received either no value or less than reasonably equivalent value for the transfers.

10. The estate may have claims based on breaches of fiduciary duties owed by its directors and officers (and the directors and officers of the Bank) to the Debtor. Such directors and officers could have failed to act in the best interests of the Debtor including, but not limited to, by authorizing such downstreaming and repeatedly failing to recognize red flags that the Bank was in financial trouble and eventually on the brink of failure. I intend to evaluate (i) whether the overlapping composition of the boards of directors of the Debtor and the Bank left the Debtor in a position in which no one was charged with protecting the separate interests of the Debtor vis-à-vis the Bank; (ii) whether the Debtor's Board of Directors acted negligently or worse in continuing to dissipate the Debtor's remaining cash for the benefit of the Bank; and (iii) whether the Debtor's Board of Directors acted negligently or worse in failing to take measures to protect the interests of the Debtor's creditors.

11. At least three class claims have been filed to date against this estate. True and correct copies of these proofs of claim are attached hereto as Exhibits 12, 13, and 14.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 14, 2008.

_____
Alfred H. Siegel

-9-

DECLARATIONS OF JULIA J. RIDER AND ALFRED H. SIEGEL, CHAPTER 7 TRUSTEE IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

March 2007-2008

| Level | Carrier | Amount | Coverage | Premium[1] | Location |
|---|---|---|---|---|---|
| Fiduciary | XL Specialty | $10 million | A, B, and C | $65,000 | Rosen Decl. Exh. I, at 244 |
| Primary | Lloyd's | $10 million | A, B, and C | $495,000 | Rosen Decl. Exh. A, at 49 |
| 1st Excess | Zurich | $10 million | A, B, and C | $315,000 | Rosen Decl. Exh. B, at 74 |
| 2nd Excess | Fed. Ins. Co. (Chubb) | $10 million | A, B, and C | $204,750 | Rosen Decl. Exh. C, at 89 |
| 3rd Excess | Nat'l Union (AIG) | $10 million | A, B, and C | $194,670 | Rosen Decl. Exh. D, at 97 |
| 4th Excess | XL Specialty | $10 million | A only | $180,000 | Rider Decl. Exh. 1, at 5 |
| 5th Excess | Arch | $10 million | A only | $123,500 | Rider Decl. Exh. 2, at 39 |
| 6th Excess | Ace | $10 million | A only | $100,000 | Rider Decl. Exh. 3, at 54 |
| 7th Excess | Axis | $10 million | A only | $100,000 | Rider Decl. Exh. 4, at 75 |

March 2008-2009

| Level | Carrier | Amount | Coverage | | |
|---|---|---|---|---|---|
| Fiduciary | XL Specialty | $10 million | A, B, and C | $78,000 | Rosen Decl. Exh. J, at 273 |
| Primary | Lloyd's | $10 million | A, B, and C | $1,030,684 | Rosen Decl. Exh. E, at 116 |
| 1st Excess | Zurich | $10 million | A, B, and C | $1,003,625 | Rosen Decl. Exh. F, at 157 |
| 2nd Excess | Hartford | $10 million | A, B, and C | $853,081 | Rosen Decl. Exh. G, at 214 |
| 3rd Excess | CNA | $10 million | A, B, and C | $724,780 | Rosen Decl. Exh. H, at 229 |
| 4th Excess | XL Specialty | $10 million | A only | $976,500 | Rider Decl. Exh. 5, at 81 |
| 5th Excess | Arch | $10 million | A only | $541,667 | Rider Decl. Exh. 6, at 83 |
| 6th Excess | Ace | $10 million | A only | $487,500 | Rider Decl. Exh. 7, at 87 |
| 7th Excess | Axis | $10 million | A only | $414,444 | Rider Decl. Exh. 8, at 95 |

---

[1] May not include statutory taxes, fees, guarantee fund taxes and other applicable state specific premium charges.