Alfred H. Siegel
A. SIEGEL & ASSOCIATES, LLC
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone: 818-827-9204
Facsimile: 818-337-1938

Chapter 7 Trustee

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re | CASE NO.: 2:08-bk-21752-BB |
| INDYMAC BANCORP, INC., | CHAPTER 7 |
| Debtor. | **NINTH INTERIM REPORT AND ACCOUNT OF ALFRED H. SIEGEL, CHAPTER 7 TRUSTEE; AND APPLICATION OF CHAPTER 7 TRUSTEE FOR AWARD OF INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES** |
| | [March 11, 2014-October 31, 2014] |
| | <u>Hearing</u> |
| | **DATE:** December 3, 2014<br>**TIME:** 2:00 p.m.<br>**CTRM:** 1475 |

**TO THE HONORABLE SHERI BLUEBOND, UNITED STATES BANKRUPTCY JUDGE, THE UNITED STATES TRUSTEE AND OTHER PARTIES IN INTEREST:**

Alfred H. Siegel, the Chapter 7 Trustee herein (the "<u>Trustee</u>" or "<u>Applicant</u>") seeks an award of interim compensation of $907,492.03 and reimbursement of expenses of $0.00 for the period from March 11, 2014 through and including October 31, 2014 (the "<u>Subject Period</u>"). Applicant certifies to the Court and to the United States Trustee that the Trustee's fees and expenses are reasonable and necessary as specified in 11 U.S.C. § 326. Applicant also respectfully represents as follows:

152302.2                                    1

## I.    INTRODUCTION

On July 31, 2008, over six years ago, IndyMac Bancorp, Inc. (the "Debtor") filed for relief under chapter 7 of the Bankruptcy Code, thereby initiating the above-captioned bankruptcy case (the "Bankruptcy Case"). The Debtor was the ultimate holding company of IndyMac Bank, FSB (the "Bank"), which was placed under the receivership of the Federal Deposit Insurance Corp. (the "FDIC"), following what was, at the time, the third-largest bank failure (in terms of assets) in United States history. Applicant was appointed interim chapter 7 trustee on August 4, 2008, and permanent chapter 7 trustee by the Court's order entered on December 8, 2008 [Docket No. 173]. Within days of the Debtor's bankruptcy filing, Applicant began a very lengthy process of administering the Debtor's complex bankruptcy estate (the "Estate").

Following intense analysis and factual investigation, Applicant determined that the Estate's primary assets were two potential causes of action: (1) claims against the Debtor's former directors and CEO (the "D&Os") for allowing or causing the Debtor to downstream $355 million to the Bank (the "Downstream Transfers") before the commencement of the Bankruptcy Case and (2) claims to ownership of over $58 million in federal and state income tax refunds (together with interest accrued thereon, the "Tax Refunds"), which the FDIC, as successor to the Bank, also claimed were its property.

As set forth in the concurrently-filed *Interim Application of Klee, Tuchin, Bogdanoff & Stern LLP Requesting: Allowance and Payment of Certain Contingent Fees and Expenses Incurred From March 11, 2014 Through October 31, 2014* (the "KTB&S Interim Application), Applicant and his professionals have faced substantial challenges in pursuing these causes of action and other Estate claims. At the outset of the Bankruptcy Case, there were no continuing employees of the Debtor to assist Applicant in his investigation. Applicant and his professionals were required to conduct their investigation by way of third-party interviews and depositions.

Likewise, although the Debtor filed schedules and a statement of financial affairs in the Bankruptcy Case (collectively, the "Schedules"), the Debtor's CEO acknowledged that they were prepared without access to the Debtor's books and records and the Schedules themselves appeared to be incomplete. Summary of Schedules at 1 [Dkt. No. 14]. These difficulties were further compounded by the fact that Trustee was not in possession of the Debtor's books and records. Those books and

records were in the possession of the FDIC, which denied Applicant access to them for months. When the FDIC finally produced those records, they were produced in a manner that required a substantial amount of time and expense to make them useful to Applicant.

The pursuit of these causes of action has spanned approximately 6 years and has been made difficult because of the opposition of the defendants to the litigation, the manner in which they have drawn out the litigation over the course of so many years, and the inordinate amount of work that has been required to respond to their defensive tactics in a multiplicity of judicial forums. Applicant incorporates by reference the discussion at pages 1-7 of the KTB&S Interim Application..

Nevertheless, Applicant and his professionals have successfully (i) realized a $15 million recovery from the Estate's claims in respect of the Downstream Transfers, (ii) litigated the Estate's entitlement to the Tax Refunds to a final judgment that resulted in a recovery of over $58.5 million, and (iii) realized in excess of $3 million in additional recoveries for the Estate. In light of the substantial progress made to date in administering the Estate's assets, based on the distributions made to date, and based on the anticipated distributions to the Estate's professionals in connection with the concurrently-filed fee applications, Applicant seeks an award of interim compensation of $907,492.03 and reimbursement of expenses of $0.00.[1]

## II. HISTORY OF CASE

Applicant hereby incorporates by the "Narrative History of the Case" section of the KTB&S Interim Application at pages 16-18, pursuant to Local Bankruptcy Rule 2016-1(a)(1)(A)(iv).

## III. ASSETS

As noted, the Estate's primary assets at the outset of this case were comprised of (i) rights of action against the Ds&Os (and certain insurance carriers) in respect of the Downstream Transfer, and (2) rights of action with respect to ownership of the Tax Refunds. As set forth in the Trustee's prior report, the claims with respect to the Downstream Transfers resulted in a $15 million settlement and compromise. Since that report was filed, the Court approved the settlement and the Trustee received

---

[1] This request is premised on approval of the pending professional fee applications (also scheduled for hearing on December 3, 2014) and on the actual distribution of those amounts to the Trustee's professionals. If and to the extent those fee applications are not approved, the Trustee's request herein will be reduced accordingly. Moreover, the Trustee does not intend to disburse to himself any fee based on disbursements to professionals, until those distributions are actually made.

152302.2                                3

the $15 million settlement payment from insurance proceeds. This aspect of the case has thus been finally resolved.

With respect to the Tax Refunds, the United States District Court for the Central District of California (the "District Court") entered on May 30, 2012 its *Order Accepting Bankruptcy Court's Report & Recommendation* in Civil Case No. 2:12-cv-02967-RGK, and on June 19, 2012, entered its *Judgment* ruling that the Tax Refunds are property of the Estate (the "Tax Refund Judgment"). The United States Court of Appeals for the Ninth Circuit thereafter affirmed the Tax Refund Judgment. *See FDIC v. Siegel (In re IndyMac Bancorp, Inc.)*, 554 F. App'x 668 (9th Cir. 2014), *reh'g & reh'g en banc denied* (9th Cir. June 27, 2014).

On September 26, 2014, the deadline for the FDIC to petition the Supreme Court for a writ of certiorari expired without any such petition being filed, thereby rendering the Tax Refund Judgment a final, unappealable judgment in favor of the Estate. The Trustee and the FDIC subsequently negotiated and entered into a settlement agreement (the "Settlement Agreement") that, among other things, resolves almost all of their remaining disputes (including over $5 billion in purported priority claims asserted by the FDIC) and provides for the consensual transfer of ownership and control over the bank accounts containing the Tax Refunds (the "Joint Tax Accounts") to the Trustee. A hearing on approval of the Settlement Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019 is scheduled for the same date as the hearing on this Application, i.e., December 3, 2014.

As of the petition date, the Debtor had over $19.5 million on deposit in its bank accounts. Since then, the Applicant and his professionals have successfully augmented the Estate with the following recoveries:

| RECOVERIES | |
|---|---|
| Settlement of the D&O litigation | $15,000,000.00 |
| D&O attorneys retainers | $900,000.00 |
| Officer loans | $163,306.39 |
| High-interest loans | $952,831.72 |
| Heller settlement | $250,000.00 |
| Orrick settlement | $349,153.99 |
| Dykema settlement | $200,000.00 |

152302.2                                4

| | |
|---|---|
| JPMorgan settlement | $190,000.00 |
| Allen Matkins judgment | $750,000.00 |
| Alston & Bird settlement | $50,000.00 |
| Bankers' Bond settlement | $60,000.00 |
| **Subtotal Through March 10, 2014** | **$18,865,292.10** |
| Tax Refunds | $58,593,252.20 |
| **GRAND TOTAL (TO DATE)** | **$77,458,544.30** |

Pursuant to Local Bankruptcy Rule 2016-1(a)(1)(A)(iv), Applicant incorporates by this reference the detailed description of the recoveries realized prior to March 11, 2014 that is set forth in pages 24-29 of the prior interim application filed by KTB&S,[2] as well as the discussion of the Tax Refund litigation at pages 1-7 of the KTB&S Interim Application.[3]

### III.    CLAIMS AGAINST THE ESTATE

The general bar date passed on November 26, 2008 and the bar date for governmental entities to file claims passed on January 27, 2009. Since the petition date, creditors have filed 95 proofs of claim and claim amendments in this case. Applicant has made substantial progress in resolving those claims. For instance, Applicant entered into a settlement pursuant to which three class action ERISA claims (the only ERISA claims filed) were withdrawn in exchange for relief from stay to access the Debtor's fiduciary insurance policy [Dkt. No. 464]. Applicant filed several omnibus claims objections, which subsequently were granted by orders of the Court, disallowing millions of dollars of claims asserted against the Estate. [Dkt. Nos. 854, 855, 856]. Applicant also has prevailed on several creditors to withdraw their claims without the necessity of filing objections. [Dkt. Nos. 834, 862].

The claims against the Estate that have not yet been disallowed or otherwise resolved by order, stipulation or withdrawal (other than the claims addressed in the pending Settlement Agreement) include the following: (i) approximately $460 million in non-duplicative, nonpriority unsecured claims (plus unliquidated amounts) asserted by indenture trustees and others based on debt securities issued

---

[2]  *See Interim Application Of Klee, Tuchin, Bogdanoff & Stern LLP Requesting: (1) Allowance And Payment Of Certain Contingent Fees And Expenses Incurred From January 1, 2011 Through March 10,2014 and (2) Payment Of Previously Allowed Professional Fees; Declaration Of Matthew C. Heyn; Proof Of Service* [Dkt. No. 781].

[3]  Includes interest accrued through October 31, 2014.

152302.2                                5

prepetition by the Debtor (the "Indenture Claims"), (ii) approximately $8.2 million in claims (plus unliquidated amounts) asserted by the Pension Benefit Guaranty Corporation relating to the termination of the IndyMac Bank, F.S.B. Defined Benefit Pension Plan ("PBGC Claims"), and (iii) other claims of approximately $1.4 million, plus other unliquidated amounts.

## IV. REMAINING WORK:

The remaining work in this case is as follows:

**Assets:** There remain a handful of miscellaneous assets for the Trustee to attempt to monetize, including certain second deed of trust mortgage loans under which the Debtor is obligee (the "Mortgage Loans") and certain mortgage-backed securities held by the Debtor. Applicant and his professionals are in the process of negotiating a potential sale of the Mortgage Loans and also exploring whether the mortgage-backed securities have any realizable value. Applicant reserves the right to pursue any additional assets that come to his attention.

**Claims**: The following claims-related work remains:

- The Applicant has almost completed negotiation of a compromise and settlement with OneWest Bank regarding its alleged claims for servicing fees and expense reimbursements in connection with the servicing of the Mortgage Loans.

- The Applicant and his professionals have opened a dialogue with the entities asserting the Indenture Claims seeking documentation and support for those claims and a definitive position with respect to the precise amounts asserted, as the original claims (i.e., filed six years ago) assert various unspecified, unliquidated amounts. The Applicant will endeavor to reach a consensual resolution of the Indenture Claims, if possible, but will proceed with formal action in the Court if necessary.

- The Applicant and his professionals have opened a dialogue with the PBGC and obtain some initial information with respect to the PBGC's claims. The Applicant and his professionals are analyzing the potential legal and factual issues raised by those claims. The Applicant will endeavor to reach a consensual resolution of the PBGC Claims, if possible, but will proceed with formal action in the Court if necessary.

- The Applicant and his professionals may pursue several other additional objections or consensual resolutions as appropriate.

**Taxes**: Based on information provided by his professionals, Applicant does not believe that there are any additional, meaningful tax refunds to be recovered for the benefit of the Estate (although he reserves his rights to pursue such recoveries). Under Applicant's direction, his accountants will continue to file all necessary tax returns on behalf of the Estate and, in connection with the winding up of the Estate, will file required final tax returns.

**V.    EXPENSES OF ADMINISTRATION**:

As of October 31, 2014, the Estate holds cash (i) in accounts of the Trustee totaling $10,492,711.72, and (ii) in the Joint Tax Accounts totaling $58,593,252.20. Upon approval of the Settlement Agreement, exclusive control of the Joint Tax Accounts and the funds therein will be vested in the Trustee. The Trustee estimates that the funds on hand, combined with future funds anticipated to be received, will be more than sufficient to pay all Chapter 7 expenses of administration.

**VI.   PRIOR FEE APPLICATIONS AND PAYMENTS TO TRUSTEE**:

In connection with Applicant's services and out-of-pocket costs, Applicant previously filed eight interim fee applications. The Court approved each of those applications and Applicant received payment as follows:

| Application and Order | Period | Fees and Expenses Approved | Payment Received |
|---|---|---|---|
| First Interim Application [Dkt. No. 255]; Order [Dkt. No. 277] | August 3, 2009 to January 29, 2009 | $108,651.53<br><br>Fees: $107,768.47<br>Expenses: $883.06 | $108,651.53 |
| Second Interim Application [Dkt. No. 339]; Order [Dkt. No. 351] | January 30, 2009 to June 30, 2009 | $142,429.17<br><br>[Fees only] | $142,429.17 |
| Third Interim Application [Dkt. No. 387]; Order [Dkt. No. 405] | July 1, 2009 to November 30, 2009 | $110.202.43<br><br>[Fees only] | $101,202.43 |

152302.2

7

| Application and Order | Period | Fees and Expenses Approved | Payment Received |
|---|---|---|---|
| Fourth Interim Application [Dkt. No. 441]; Order [Dkt. No. 457] | December 1, 2009 to April 30, 2010 | $39,874.89<br><br>[Fees only] | $39,874.89 |
| Fifth Interim Application [Dkt. No. 490]; Order [Dkt. No. 523] | May 1, 2010 to August 31, 2010 | $38,637.14<br><br>[Fees only] | $38,637.14 |
| Sixth Interim Application [Dkt. No. 547]; Order [Dkt. No. 566] | September 1, 2011 to December 31, 2010 | $33,092.83<br><br>[Fees only] | $33,092.83 |
| Seventh Interim Application [Dkt. No. 688]; Order [Dkt. No. 712] | January 1, 2011 to March 31, 2012 | $107,916.34<br><br>[Fees only] | $107,916.34 |
| Eighth Interim Application [Dkt. 780], Order [Dkt. No. 816] | | $186,123.21<br><br>Fees: $185,471.25<br>Expenses: $651.96 | $186,123.21 |
| **Totals** | | $757,927.54<br><br>Fees: $756,392.52<br>Expenses: $1,534.96 | **$757,927.54** |

Other than as set forth above, no retainer or compensation has been paid to Applicant to date. There is no provision or agreement for payment to Applicant in this case except from the Debtor's Estate in such sums as the Court may allow.

## VI.    FACTORS AFFECTING THE AWARD OF COMPENSATION

Based on disbursements made from inception of the case through October 31, 2014, in the amount of $39,627,695.42, and the amount of fees and expenses requested by the Trustee's professionals in their pending applications, which total $15,360,122.84, the Trustee's maximum compensation allowable under 11 U.S.C. § 326 (a) is $1,672,884.55. The Trustee previously has been

152302.2                                   8

paid $765,392.52 in fees pursuant to the previous Court orders; therefore, he is requesting payment of the balance totaling $907,492.03. Based on the Court's prior rulings on the fee requests of the Estate's professionals, the Trustee requests an award of 100% of this amount.

In determining the value of the Trustee's services to the Estate, the Trustee believes the Court should consider various factors, including that the amount of reasonable compensation shall be treated as a commission and that the interim fee requested is reasonable based on the time expended, the novelty and difficulty of the issues presented and the work performed, the skill requisite to perform the services, and the results obtained.

Applicant was formerly a partner in the accounting firms of Grobstein Horwath & Company LLP ("GHC") and Crowe Horwath LLP ("Crowe"). Because of this, a portion of the fee Applicant may be allowed in this case will be shared with the indicated firms. With those exception, no agreement or understanding exists for a division of fees to be received herein between the Trustee and any person whatsoever.

## VII. CONCLUSION

Wherefore, Applicant respectfully requests that the Court :

    (a) Approve, on an interim basis, fees of $907,492.03 and expenses of $0.00 for the period March 11, 2014 through and including October 31, 2014;

    (b) authorize the Trustee to pay 100% of allowed amount; and

    (c) grant such other relief that the Court may deem just and proper.

Dated: _____
ALFRED H. SIEGEL,
CHAPTER 7 TRUSTEE,
Solely in his capacity as Chapter 7 Trustee
and not in any individual capacity

152302.2

9

# VERIFICATION

I am currently the duly appointed and acting Chapter 7 Trustee of the bankruptcy estate of IndyMac Bancorp, Inc., Bankruptcy Case No. 2:08-bk-21752-BB. I have read the foregoing **NINTH INTERIM REPORT AND ACCOUNT OF ALFRED H. SIEGEL, CHAPTER 7 TRUSTEE; AND APPLICATION OF CHAPTER 7 TRUSTEE FOR AWARD OF INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES** [March 11, 2012 through October 31, 2014] and I certify that the same is true and correct of my own knowledge, except as to those matters that are stated on information and belief, and as to those matters I believe those matters to be true.

Dated: 11/12/2014

_____
ALFRED H. SIEGEL,
CHAPTER 7 TRUSTEE,
solely in his capacity as Chapter 7 Trustee
and not in any individual capacity

152302.2

10